UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

IRMA LINDA URESTI,

    Plaintiff,

v.                                                                                               Case No. 2:20-cv-367-MAP

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.
_____/

**ORDER**

This is an appeal of the administrative denial of supplemental security income (SSI) and disability insurance benefits (DIB).[1] *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Plaintiff argues her case should be remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) because the administrative law judge (ALJ) did not support his evaluation of Dr. Gallego's opinion with substantial evidence. After considering Plaintiff's arguments, Defendant's response, and the administrative record (docs. 15, 18), I affirm the ALJ's decision that Plaintiff is not disabled.

    A. *Background*

Plaintiff Irma Uresti was born on April 21, 1979, and was 38 years old on her alleged onset date of August 19, 2017. (R. 138, 151) Plaintiff earned her GED in 2013 and has past relevant work as a cashier at Goodwill, Dollar Tree, and 7-Eleven and as a migrant worker on harvesting crews. (R. 23-24) Plaintiff was married until 2006, when her husband died in Mexico under suspicious circumstances. This, combined with other complicated family

---

[1] The parties have consented to my jurisdiction under 28 U.S.C. § 636(c).

circumstances, prompted Plaintiff to move from Texas to Florida in 2017. She has an adult daughter.

Plaintiff alleges disability due to depression, bipolar disorder, PTSD, right knee problems, diabetes, and peripheral neuropathy. (R. 25) She contends she has been unable to work since August 19, 2017. (R. 138) A few months before her alleged onset date, she slipped and fell at Goodwill, injuring her back and right knee. She received a small worker's compensation settlement after the accident and returned to work at Goodwill for a couple more months before reinjuring her right knee. (R. 25, 144-45) Plaintiff testified that whenever she complained about knee pain to her supervisors, they did not give her lighter work duties. Instead, in her words, "they send me to the back to do heavier stuff, and that's when my knee popped, but it didn't pop there . . . And I went home, and it popped, and I couldn't step on it until they injected me with something at the hospital." (R. 29) Finally, she felt she could not work anymore. (R. 30) She has a torn right meniscus she has not had surgically corrected because she cannot afford the procedure.

Already struggling with her weight, Plaintiff gained more after her back and knee injuries. (R. 31-32, 44) She was diagnosed with type 2 diabetes but had a severe allergic reaction to the medication doctors prescribed to control it. (R. 47) Doctors eventually diagnosed her with Steven-Johnson Syndrome, a disorder of the skin and mucous membranes that kills the top layer of skin and is usually a reaction to medication. Self-conscious about her skin (she testified it would flake off like a snake's), she isolated herself: "Because I feel like when everything happened with my skin, everybody would stare at me, and I just feel like everybody stares at me. So I isolate myself." (R. 67) She has trouble focusing, her mind races, and she lacks energy.

Plaintiff testified she can walk less than 50 yards, lift less than five pounds, stand and sit for less than 15 minutes without changing positions, and needs to lie down four times a day for 30 minutes at a time. (R. 63) Since February 2018, she has treated with psychiatrist Manuel Gallegos, M.D. of Community Care Family Clinic in Arcadia, about once every two weeks, and sees a social worker at the clinic every week. (R. 42) Donald Reimer, LCSW, summed up Plaintiff's traumatic past: she was emotionally, sexually, and physically abused as a child, she had her daughter at 16 with a man who abused and tried to kill her, and she was in prison for a drug conviction from 2000-2003. (R. 880) Plaintiff now lives with a friend and two Chihuahuas. She testified she spends her days listening to Christian music, texting her daughter and sister, caring for her dogs, reading the Bible, and doing very minor household chores. (R. 36-38) She does not have a driver's license due to unpaid tickets in Texas and relies on a friend or taxis to get places. She isolates herself at home except when she needs to grocery shop or go to a doctor's appointment.

In his written decision issued after Plaintiff's administrative hearing, the ALJ found Plaintiff has the severe impairments of "diabetes mellitus with peripheral neuropathy, meniscus tear right knee, morbid obesity, bipolar disorder, Post-Traumatic Stress Disorder (PTSD), recurrent major depressive disorder moderate." (R. 141) Aided by the testimony of a vocational expert (VE), the ALJ determined Plaintiff is not disabled as she has the RFC to perform sedentary work:

> Except the claimant is able to lift and/or carry a maximum of 10 pounds; stand and/or walk 6 hours in an eight-hour workday; sit six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds due to obesity; occasionally climb ramps and stairs; frequently balance; occasionally stoop, kneel, crawl, and crouch; must avoid workplace hazards such as unprotected heights and unshielded machinery; simple routine repetitive tasks; and she must alternate sitting and standing at 30 minute intervals.

(R. 143) Based on the VE's testimony, the ALJ found that, with this RFC, Plaintiff cannot perform her past relevant work (which the ALJ categorized as a cashier II composite job) but is not disabled because she can work as a routing clerk, a cashier II, or a raw shellfish preparer (R. 152) The Appeals Council denied review. Plaintiff, having exhausted her administrative remedies, filed this action.

B. *Standard of Review*

To be entitled to DIB and/or SSI, a claimant must be unable to engage "in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *See* 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Social Security Administration, to regularize the adjudicative process, promulgated detailed regulations that are currently in effect. These regulations establish a "sequential evaluation process" to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Under this process, the Commissioner must determine, in sequence, the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment(s) (*i.e.*, one that significantly limits her ability to perform work-related functions); (3) whether the severe impairment meets or equals the medical criteria of

Appendix 1, 20 C.F.R. Part 404, Subpart P; (4) considering the Commissioner's determination of claimant's RFC, whether the claimant can perform her past relevant work; and (5) if the claimant cannot perform the tasks required of her prior work, the ALJ must decide if the claimant can do other work in the national economy in view of her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A claimant is entitled to benefits only if unable to perform other work. *See Bowen v. Yuckert*, 482 U.S. 137, 142 (1987); 20 C.F.R. § 404.1520(f), (g); 20 C.F.R. § 416.920(f), (g).

In reviewing the ALJ's findings, this Court must ask if substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The ALJ's factual findings are conclusive if "substantial evidence consisting of relevant evidence as a reasonable person would accept as adequate to support a conclusion exists." *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citation and quotations omitted). The Court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds the evidence preponderates against the ALJ's decision. *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Keeton*, 21 F.3d at 1066 (citations omitted).

C. *Analysis*

Plaintiff advances one argument: the ALJ's consideration of Dr. Gallego's opinions is unsupported by substantial evidence (Doc. 18 at 14-19). The Commissioner disagrees, contending that under the revised Social Security Administration (SSA) regulations, the ALJ

properly evaluated Dr. Gallegos's opinions for supportability and consistency and found them unpersuasive (*Id.* at 19-34).

To backtrack, prior to March 27, 2017, SSA regulations codified the treating physician rule, which required the ALJ to assign controlling weight to a treating physician's opinion if it was well supported and not inconsistent with other record evidence. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). Under the treating physician rule, if an ALJ assigned less than controlling weight to a treating physician's opinion, he or she had to provide good cause for doing so. *See Winschel v. Comm'r of Soc. Sec*, 631 F.3d 1176, 1178-79 (11th Cir. 2011). Good cause existed "when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (citation omitted).

In this case, however, revised SSA regulations (published on January 18, 2017, and effective on March 27, 2017) apply because Plaintiff filed her claim on September 20, 2017. (*See* R. 138) These new regulations eliminate the treating physician rule. As the SSA explained, "under the old rules, courts reviewing claims tended to focus more on whether the agency sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our final decision … *these courts, in reviewing final agency decisions, are reweighing evidence instead of applying the substantial evidence standard of review, which is intended to be highly deferential to us.*" Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017) (emphasis added).

The new regulations require an ALJ to apply the same factors when considering the opinions from *all* medical sources. 20 C.F.R. §§ 404.1520c(a); 416.920c(a). As to each

medical source, the ALJ must consider: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. §§ 404.1520c(c); 416.920c(c). But the first two factors are the most important: "Under the new rule, the SSA will consider the persuasiveness of all medical opinions and evaluate them primarily on the basis of supportability and consistency." *Mackey v. Saul*, 2020 WL 376995, at *4, n. 3 (D.S.C. Jan. 6, 2020), citing 20 C.F.R. § 404.1520c(a),(c)(1)-(2) (while there are several factors ALJ must consider, "[t]he most important factors ... are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section).").[2] In a recent case decided under the old regulations, the Eleventh Circuit observed that "these factors [in the new regulations] continue to indicate the importance of treating physicians' opinions – especially where the physician has maintained a longstanding and consistent relationship with the claimant." *Simon v. Comm'r of Soc. Sec.*, __ F.3d __, 2021 WL 2345638, at *7, n.4 (11th Cir. June 9, 2021).

"Supportability" refers to the principle that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. 404.1520c(c)(1), 416.920c(c)(1). "Consistency" refers to the principle that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical

---

[2] In fact, ALJs are not required to explain how they considered factors 3 through 5 (20 C.F.R. 404.1520c(b)(2), 416.920c(b)(2)) unless the record contains differing but equally persuasive medical opinions or prior administrative medical findings about the same issue. *See* 20 C.F.R. 404.1520c(b)(3), 416.920c(b)(3).

7

sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. 404.1520c(c)(2), 416.920c(c)(2).

The new regulations also change the standards an ALJ applies when articulating his or her assessment of medical source opinions. First, as mentioned above, an ALJ need not assign specific evidentiary weight to medical opinions based on their source. *See Tucker v. Saul*, No. 4:19-cv-759, 2020 WL 3489427, at *6 (N.D. Ala. June 26, 2020). Second, because the new regulations eliminate the treating physician rule, the ALJ no longer needs to "give good reasons" for the weight he or she assigns to treating source opinions. *Compare* 20 C.F.R. § 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion.") *with* 20 C.F.R. § 416.920c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources."). Third, while the ALJ must explain how he or she considered the supportability and consistency factors for a medical source opinion, the ALJ need not explain how he or she considered any other factors. 20 C.F.R. § 416.920c(b)(2).

Here, Dr. Gallego was Plaintiff's treating psychiatrist from February 2018 through her March 7, 2019 hearing date. After treating Plaintiff for a year, Dr. Gallego completed three check-the-box forms at Plaintiff's request in support of her disability application. (R. 1047-53) The first form pertained to Listing 12.04 (depressive, bipolar, and related disorders); Dr. Gallego placed slash marks next to three out of four of the "B" criteria but did not indicate which limitations were extreme or marked or provide any other explanation.[3] (R. 1047-48)

---

[3] The ALJ found that Plaintiff does not meet this listing (R. 142-43), and Plaintiff does not challenge this.

On the second form, titled "Medical Statement Concerning Depression with Anxiety, OCD, PTSD or Panic Disorder for Social Security Disability Claim," Dr. Gallego checked the box for "markedly impaired" in numerous categories, including Plaintiff's ability to carry out short and simple instructions, follow detailed instructions, and maintain attention and concentration for extended periods of time, while leaving the "comments" section of the form blank. (R. 1049-51)  On the third form, titled "Medical Statement Regarding Attention Deficit Hyperactivity Disorder for Social Security Disability Claim" (a mental impairment the ALJ did not identify as among Plaintiff's severe impairments), Dr. Gallego circled "Extreme" corresponding to Plaintiff's ability to maintain concentration, persistence, and pace.  Plaintiff was "markedly limited" in her ability to care for herself, among other things.  Dr. Gallego again left the "comment" section blank. (R. 1052-530)

> In evaluating Dr. Gallego's opinions, the ALJ stated:
>
> I am not persuaded by the opinions of the claimant's physician, Dr. Gallego. The medical record findings from Dr. Gallego are inconsistent with these opinions.  The claimant began mental health treatment in February 2018 and quickly improved within a few weeks and continued with medication management and therapy.  In February after medication, the claimant reported she is able to maintain relationships, does not interfere with activities of daily living, has a good mood, no anxiety, no panic, and sleeping well.  On mental status examination, Dr. Gallego found the claimant well-groomed, cooperative, calm, pleasant, focused and not easily distracted, normal attention span, fluent and clear speech, intact motor activity, oriented, alert, intact memory, euthymic mood, happy affect and congruent to thought, intact thought process, and intact insight and judgment.  These findings from February 2018 are consistent with the findings on examination from Texas in 2016 and the vocational rehabilitation psychologist.  I am not persuaded by the debilitating opinions after many months of therapy and medication management with prior multiple mental status findings showing at most moderate limitations.

(R. 150)

The ALJ's consideration of Dr. Gallego's opinions tracks the new regulations and is supported by substantial evidence. Before becoming a patient of Dr. Gallego's, Plaintiff sought treatment from Edgar Hein, M.D. at Border Region Behavioral Health Center in Laredo, Texas in November 2016. She described feelings of helplessness and hopelessness, she cried easily, and she reported that she had gained weight. (R. 438-45) She felt depressed and listless. Plaintiff told Dr. Hein she had been prescribed psychotropic medication while in prison from 2000-2003, but had been off medication since her release. (R. 442) Dr. Hein diagnosed depression with recurrent psychosis and prescribed Abilify and sertraline. (R. 438, 444)

A year later, after Plaintiff moved to Florida, Plaintiff was evaluated by psychologist Theodora Coffman, Ph.D. to formulate a vocational rehabilitation plan following her injury at Goodwill. (R. 723-28) Dr. Hoffman assessed Plaintiff with "major depressive disorder of moderate severity" and generalized anxiety disorder. (R. 725) She observed Plaintiff was tearful but thought clearly and coherently. Plaintiff concentrated and stayed on task for the hour-long evaluation. Dr. Hoffman administered an IQ test; Plaintiff was in the low average range but demonstrated a "clinically significant weakness" in verbal comprehension. (R. 726) Dr. Coffman concluded that "it is possible for [Plaintiff] to return to work if provided the appropriate supports," but recommended Plaintiff get mental health treatment because her "mental health concerns could be a barrier to employment." (R. 728) Dr. Coffman opined that if Plaintiff found a job, her symptoms of depression may lessen. (*Id.*)

Plaintiff took Dr. Coffman's advice and began treatment at Community Health Clinic in February 2018. Social worker Estafan Farag, LCSW met with Plaintiff on February 1, 2018, and Plaintiff told him she was unable to maintain relationships, was lonely and irritable,

and did not want to live. (R. 872)  Her mental health symptoms interfered with her activities of daily living (ADLs), she said.  She felt anxious and depressed because of her skin condition, and she missed her family in Texas.  Plaintiff told Mr. Farag she had flashbacks of the physical and sexual abuse she had endured.  She had trouble sleeping and isolated herself. (R. 874)

Then, on February 9, 2018, Plaintiff treated with Dr. Gallego for the first time. (R. 864) She complained of depression yet reported she could maintain relationships, her depression did not interfere with her ADLs, and she had no major life stressors. (R. 866) Plaintiff was sad, irritable, and anxious and made little eye contact.  Dr. Gallego assessed her with recurrent depressive episodes (moderate) and prescribed Paxil. (R. 867)  A week later, Plaintiff again relayed that her depression and anxiety do not interfere with her relationships and ADLs. (R. 861)  Her memory was intact, and she was cooperative and alert.  And at Plaintiff's next appointment on February 23, 2018, Dr. Gallego noted Plaintiff was focused, not easily distracted, and had a normal attention span. (R. 857)  She was alert and oriented with an intact memory.  Despite reporting panic attacks, Plaintiff said her symptoms did not interfere with her ADLs.  Dr. Gallego diagnosed her with a panic disorder and agoraphobia and prescribed Ativan, lorazepam, and trazodone (in addition to Paxil). (R. 859)

Around this time, state agency psychologist Heather Bradley, Ph.D. reviewed Plaintiff's treatment history (including her treatment at Community Health Clinic) and concluded that through the date of her report (March 2018), Plaintiff's psychological symptoms would not impose more than a minimal limitation on her ability to work. (R. 127) After that and throughout March 2018, Plaintiff's mental status exams with Dr. Gallego were relatively normal, but she was still sad, irritable, depressed, and angry.  Her judgment was

intact, her energy level good, and she said she was able to maintain relationships. Dr. Gallego continued Plaintiff on her medication regimen (R. 938-41)

During an early June 2018 diabetes assessment, Plaintiff exhibited good judgment and insight, an intact memory, and a stable mood. (R. 912) During a June 15, 2018 appointment with Dr. Gallego, however, she struggled to pay attention, appeared disheveled, and was irritable. He re-prescribed her medication. (R. 906-08) Also in June 2018, Plaintiff met with social worker Mr. Reimer and reported panic attacks, insomnia, and increased anxiety. (R. 903-05) Based on Plaintiff's description of her childhood traumas, Mr. Reimer added PTSD to Plaintiff's list of diagnoses.

During a second appointment with Mr. Reimer, Plaintiff asked him to complete a mental impairment questionnaire to supplement her disability application. (R. 902) He wrote he had seen Plaintiff twice and opined that her prognosis was unclear until she reduced her symptoms. He checked boxes on the form indicating Plaintiff had "marked" functional limitations in these areas: the ability to engage in ADLs, maintain social functioning, maintain concentration, persistence, and pace, and had at least three episodes of decompensation within the previous 12 months lasting at least two weeks. (*Id.*) Mr. Reimer opined Plaintiff was unable to function independently outside of her house and could not work; she "needs therapy to break with her traumatic past." (*Id.*)

On June 29, 2018, Dr. Gallego treated Plaintiff and noted she was depressed and suffered panic attacks that were worse in the evening. (R. 899, 906) She had low energy, anhedonia, and insomnia. Dr. Gallego wrote that Plaintiff had a poor work history because she struggled to get along with co-workers. Then, after a short break in Plaintiff's treatment with him, Dr. Gallego saw Plaintiff in October 2018, and noted her irritability and inability

to focus. (R. 1027) Yet two months later in December 2018, Plaintiff reported to Dr. Gallego that she had no symptoms of depression or anxiety; he continued her on medication. (R. 1014)

On this record, the ALJ's consideration of Dr. Gallego's opinions is supported by substantial evidence. Dr. Gallego's February 2019 forms contain check marks and slashes indicating Plaintiff's extreme level of impairment in different areas, yet his treatment notes paint the picture of a depressed patient with serious psychiatric disorders who was improving overall through medication and counseling. This is supported by the findings of state agency psychologist Dr. Bradley and vocational rehabilitation specialist Dr. Coffman. The very nature of Plaintiff's mental illness presupposes good and bad days, but the ALJ did not focus on only the good – he also discussed Mr. Gallego's February 2019 findings, Mr. Reimer's dire mental impairment questionnaire, and Plaintiff's appointments with Dr. Gallego where she made little eye contact, appeared disheveled, struggled to pay attention and concentrate, and was irritable and anxious. (R. 146-47) The ALJ analyzed Dr. Gallego's opinions for supportability and consistency, and found them unpersuasive. The substantial evidence I summarized above supports this.

At this point in the analysis I emphasize that, to the extent Plaintiff asks me to re-weigh the evidence or substitute my opinion for that of the ALJ, I cannot. If the ALJ's findings are based on the correct legal standards and are supported by substantial evidence – as they are here – the Commissioner's decision must be affirmed even if I would have reached a different conclusion. *See Bloodsworth*, 703 F.2d at 1239. "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, ___ U.S. ___; 139 S.Ct. 1148, 1154 (2019). In other words, I am not permitted to reweigh the evidence or substitute my own judgment for that of the ALJ even if

I find the evidence preponderates against the ALJ's decision. *See Bloodsworth*, 703 F.2d at 1239. On this record, the ALJ did not err.

D. *Conclusion*

For the reasons stated above, it is ORDERED:

(1) The Commissioner's decision is AFFIRMED.

(2) The Clerk of Court is directed to enter judgment for the Commissioner and close the case.

DONE and ORDERED in Tampa, Florida on June 28, 2021.

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE